**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

JOHN P. HOLBROOK, SR.,      )     CASE NO.  4:11-cv-1042
                               )
      Plaintiff,            )
                               )     MAGISTRATE JUDGE
      v.                 )     VECCHIARELLI
                               )
MICHAEL J. ASTRUE,        )
   Commissioner of Social Security,   )
                               )     **MEMORANDUM OPINION AND**
      Defendant.        )     **ORDER**

Plaintiff, John P. Holbrook, Sr. ("Plaintiff"), challenges the final decision of

Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"),

denying Plaintiff's application for Supplemental Security Income ("SSI") under Title XVI

of the Social Security Act, 42 U.S.C. § 1381 *et seq.* ("the Act").  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United

States Magistrate Judge pursuant to the consent of the parties entered under the

authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

On April 22, 2008, Plaintiff filed an application for SSI and alleged a disability

onset date of May 3, 1996.  (Tr. 40.)  The application was denied initially and upon

reconsideration, so Plaintiff requested a hearing before an administrative law judge

("ALJ").  (Tr. 40.)  On January 6, 2010, an ALJ held Plaintiff's hearing.  (Tr. 40.)  Plaintiff

appeared, was represented by counsel, and testified.  (Tr. 40.)  A vocational expert

("VE") also appeared and testified.  (Tr. 40.)

On April 8, 2010, the ALJ found Plaintiff not disabled.  (Tr. 49.)  On April 13,

2011, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision

became the Commissioner's final decision.  (Tr. 1.)  On May 21, 2011, Plaintiff filed his

complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On November 7, 2011, Plaintiff filed his Brief on the Merits.  (Doc. No. 16.)  On

December 22, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 17.)

Plaintiff did not file a Reply Brief.

Plaintiff asserts two assignments of error:  (1) the ALJ improperly assessed the

credibility of Plaintiff's subjective complaints of pain; and (2) the ALJ improperly

assessed Plaintiff's orthopedic impairments in his step three determination of whether

those impairments, either singly or in combination, met or medically equaled an

impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was 42 years old on the date he filed his application for SSI.  (Tr. 46.)

He has a limited education and is able to communicate in English.  (Tr. 47.)  He does

not have past relevant work experience.  (Tr. 47.)

### B.    Medical Evidence

Plaintiff's assignments of error relate to only his orthopedic impairments; accordingly, the following summary of the medical evidence will related to only Plaintiff's orthopedic impairments.

On September 19, 2001, an x-ray of Plaintiff's left knee revealed "moderate to marked degenerative changes."  (Tr. 270.)

On August 7, 2002, Plaintiff was involved in a motor vehicle accident.  (Tr. 258.) The emergency services personnel reported that Plaintiff complained of pain in his neck, back, and ankle.  (Tr. 258.)  He was diagnosed with a cervical sprain, lumbar sprain, and right ankle contusion; and he was provided with a crutch.  (Tr. 253.)

On February 12, 2003, Plaintiff presented to Forum Health Trumbull Memorial Hospital because he allegedly "overdosed."  (Tr. 261.)  Dr. Edward C. Pierson, M.D., attended to Plaintiff and reported the following.  (Tr. 261.)  Plaintiff has a history of a fractured knee, as well as back and shoulder "difficulties."  (Tr. 261.)  Plaintiff reported that chronic pain in his knee, back, and shoulder interfered with his sleep and inhibited his appetite.  (Tr. 261.)

On August 30, 2005, an x-ray of Plaintiff's left knee revealed significant degenerative changes involving the medial and, to a lesser extent, lateral tibiofemoral compartments, as well as the patellar femoral compartment.  (Tr. 291.)  The radiologist's impression was that Plaintiff had moderately severe spondylotic changes in his left knee.  (Tr. 291.)  An x-ray of Plaintiff's lumbar spine also taken that day was negative.  (Tr. 292.)

3

On March 12, 2007, Plaintiff presented to Dr. Mary-Helene Massullo[1] for a physical examination at the request of the Bureau of Disability Determination.  (Tr. 338-42.)  Dr. Massullo indicated that Plaintiff reported his medical history as follows.

Plaintiff injured his back 15 years prior when he was hit head-on by a tow motor and was thrown into a brick wall.  (Tr. 338.)  An x-ray of his back shortly thereafter revealed a dislocated vertebra and disc.  (Tr. 338.)  Subsequent bed rest and physical therapy had not helped him.  (Tr. 338.)  An x-ray four years later revealed a crushed disc.  (Tr. 338.)  He suffered pain at the L1 region of his back that radiated bilaterally down his lower extremities.  (Tr. 338.)

Plaintiff attributed his neck pain to the same tow motor accident that allegedly caused his back pain.  (Tr. 339.)  He suffered discomfort in the C7 to T1 region of his neck and back and numbness in his hands.  (Tr. 339.)

Plaintiff also dislocated his left knee 10 years prior during a football game.  (Tr. 338.)  Initially, he had his knee drained and placed in a brace.  (Tr. 338.)  He thereafter underwent arthroscopic surgery, whereupon his knee was cleaned and drained.  (Tr. 338.)  Two years later, he underwent another arthroscopic surgery, whereupon his bone marrow was drained and his knee was debrided.  (Tr. 338.)  The results of both surgeries were "bad."  (Tr. 338-39.)  A year later, he presented to a specialist and underwent another arthroscopic surgery whereupon his ACL was repaired.  (*See* Tr. 339.)  The results of the third surgery were "pretty good," although Plaintiff continued to suffer pain in his left knee.  (Tr. 339.)

---

[1] The record does not clearly indicate Dr. Massullo's credentials.

4

Dr. Massullo further indicated that Plaintiff reported having "a hard time keeping a job" because of his back and chronic headaches, but that he did not use an assistive ambulatory device.  (Tr. 338.)  Dr. Massullo noted that Plaintiff first stated he could walk for only one yard but thereafter stated that he could walk for 100 yards; and that he could ascend and descend stairs with the use of a railing.  (Tr. 339.)

Upon physical examination, Dr. Massullo reported the following.  Plaintiff exhibited an abnormal gait with a slight limp favoring the left lower extremity.  (Tr. 342.)  Range of motion testing, however, was unreliable because it was "very inconsistent," as Plaintiff's range "went from minimal to normal" and Plaintiff was able to move within in a range that he often claimed he could not move.  (Tr. 341.)  Plaintiff had chronic changes in his left knee, and his left knee deviated outward laterally as compared to the right knee.  (Tr. 341, 342.)  Plaintiff also had diminished sensation in his left lower extremity.  (Tr. 342.)  Dr. Massullo also indicated, pursuant to Plaintiff's subjective reports, that Plaintiff had chronic low back pain, chronic arthralgia in the left knee, and chronic cervical pain.  (Tr. 342.)

An x-ray of Plaintiff's left knee revealed "severe medial joint space narrowing along with alignment offset/subluxation of the tibial and femoral cortex."  (Tr. 347.)  An x-ray of Plaintiff's lumbar spine revealed only "[m]ild scattered facet hypertrophy and disc space narrowing [at] multiple levels . . . greatest at L4-L5 and L5-S1"; and no fractures, dislocations, bony destruction, lysis or listhesis, compression sites or free bone fragments, or blastic or lytic processes.  (Tr. 347.)

Dr. Massullo concluded that Plaintiff would be "compromised" in any occupation that would require prolonged walking or traveling using his lower extremities, and

5

bending or squatting using his left lower extremity.  (Tr. 342.)

On May 15, 2007, Plaintiff presented to the emergency department with a complaint of moderate to severe pain in his left knee.  (Tr. 402.)  An x-ray of Plaintiff's left knee revealed advanced tricompartmental osteoarthritis and small joint effusion. (Tr. 459.)

On May 22, 2007, state agency reviewing physician James Gahman, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") as follows.  (Tr. 372-79.)  Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; and sit, stand, and walk for about 6 hours in an 8-hour workday with normal breaks.  (Tr. 373.)  His ability to push and pull were unlimited except to the extent that he was limited in his ability to lift and carry.  (Tr. 373.)  He could frequently climb ramps and stairs but never climb ladders, ropes or scaffolds; frequently balance and stoop; and occasionally kneel, crouch, and crawl.  (Tr. 374.)  He had no manipulative, visual, communicative, or environmental limitations.  (Tr. 375-76.)  Dr. Gahman found that Plaintiff's subjective statements of the extent to which he was limited were not fully credible because "the claimant gave inconsistent effort during [Dr. Massullo's] evaluation."[2]  (Tr. 377.)

On May 23, 2007, an MRI of Plaintiff's left knee revealed "[e]xtremely advanced degenerative osteoarthritic changes" and "moderate knee joint effusion."  (Tr. 458.)

On July 22, 2007, Plaintiff presented to the emergency department with a complaint of intermittent numbness and tingling in both of his hands that radiated up his

---

[2] Dr. Gahman explained that Plaintiff "reported that he could not do range of motion testing but was observed to move to normal ranges[, h]is gait was observed to be inconsistent[, and h]e also gave inconsistent effort in strength testing."  (Tr. 377.)

arms. (Tr. 404-05.) Dr. M. Savino, D.O., attended to Plaintiff and indicated that Plaintiff reported he had fallen off his roof a week prior. (Tr. 404.) Dr. Savino reported the following. X-rays of Plaintiff's cervical spine and left hand were negative. (Tr. 404.) Upon physical examination, Plaintiff exhibited full range of motion and no tenderness in his neck or spine. (Tr. 404.) Dr. Savino diagnosed Plaintiff with peripheral neuropathy and discharged Plaintiff in an improved condition with instructions to follow up with "Dr. Malvasi" or return to the emergency department if his condition worsened. (Tr. 405.)

On August 30, 2007, Plaintiff presented to the emergency department with a complaint of pain in his hands, wrists, and elbows. (Tr. 406.) The attending physician was of the impression that Plaintiff suffered cervical radiculopathy. (Tr. 407.)

On September 4, 2007, Plaintiff presented to the emergency department with a complaint of headaches and paresthesias. (Tr. 408.) Dr. Alisa Roberts, D.O., attended to Plaintiff and diagnosed Plaintiff with cervical disc disease. (Tr. 409.)

On February 11, 2008, Plaintiff presented to the emergency department with a complaint of mild to moderate neck pain. (Tr. 410.) The attending physician was of the impression that Plaintiff suffered cervical disc disease per Plaintiff's history. (Tr. 411.)

On April 22, 2008, Plaintiff presented to the emergency department with a complaint of mild neck pain. (Tr. 412.) The attending physician was of the impression that Plaintiff suffered degenerative joint disease in the cervical spine. (Tr. 413.)

On May 12, 2008, Plaintiff returned to Dr. Massullo for another physical examination at the request of the Bureau of Disability Determination. (Tr. 419.) Dr. Massullo indicated that Plaintiff reported he was unable to walk, bend, or lift. (Tr. 419.) Dr. Massullo reported the following upon physical examination. Plaintiff's gait was

7

abnormal with a limp that favored the left lower extremity.  (Tr. 422.)  Plaintiff wore a

knee brace, but he did not appear to need an assistive ambulatory device.  (Tr. 422.)

He was able to grasp and manipulate with both hands.  (Tr. 422.)  His joints did not

present heat, redness, thickening, or swelling.  (Tr. 422.)  The range of motion in his left

knee was restricted in full flexion, and he was unable to walk on his toes on the left

side.  (Tr. 422.)  Further, there was atrophy in his lower left extremity.  (Tr. 422.)

Dr. Massullo concluded that, in light of Plaintiff's limp, atrophy, and history of

surgical intervention on the left knee, "[a]ny occupation that would require prolonged

kneeling, standing, traveling, using [the] lower extremities, [and] walking may be slightly

compromised."  (Tr. 423.)

On July 9, 2008, state agency reviewing physician Ronald Cantor, M.D.,

assessed Plaintiff's physical RFC.  (Tr. 449-56.)  Dr. Cantor's findings were consistent

with state agency reviewing physician Dr. Gahman's opinions dated May 22, 2007,

except that he found Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and

scaffolds; balance; stoop; kneel; crouch; and crawl.  (Tr. 451.)

On August 6, 2008, an MRI of Plaintiff's left knee revealed "[v]ery severe arthritic

changes in all 3 compartments particularly medial."  (Tr. 460.)  Further, the "ACL graft

[did] not appear intact"; there was "[a]bnormal bowing and signal within the posterior

cruciate ligament; and there were "[i]ntra articular loose bodies associated with joint

effusion and popliteal cyst."  (Tr. 460.)

On September 29, 2008, Plaintiff presented to Dr. Michael A. Jones, D.O., for an

evaluation of his left knee pain.  (Tr. 510.)  Dr. Jones reported that Plaintiff had ACL

reconstruction surgery 18 years prior followed by several arthroscopic surgeries that

8

provided Plaintiff with only temporary relief; Plaintiff had been taking Percocet and Valium for the past month for the pain in his knee; and Plaintiff wore an ACL deterioration brace but continued to suffer pain and instability in his knee.  (Tr. 510.) Dr. Jones reported upon physical evaluation that Plaintiff had 5- to 10-degree flexion contracture; limited flexion to about 125 degrees; minor increased anterior translation to drawer testing; crepitation in the patellofemoral joint with range of motion; and no significant effusion.  (Tr. 510.)  Dr. Jones indicated that x-rays of Plaintiff's left knee revealed significant osteophyte formation and complete loss of medial cartilage height; erosion of the posteriomedial tibial plateau from arthritis; subchondral bone cysts; and about 15 degrees of varus alignment radiographically.  (Tr. 510.)  In short, Dr. Jones found that Plaintiff suffered end-stage degenerative joint disease in the left knee.  (Tr. 510.)  Dr. Jones reported that he explained at length the various treatment options for Plaintiff's knee, and that Plaintiff requested a total knee replacement because all conservative measures had failed.  (Tr. 510.)

On November 5, 2008, Plaintiff underwent a total left knee replacement performed by Dr. Jones.  (Tr. 542, 554.)

On November 13, 2008, Plaintiff presented to Dr. Neuendorf to follow up on the results of an MRI of his lumbar spine and an EMG of his lower extremities.  (Tr. 516.) Dr. Neuendorf reported the following.  Plaintiff presented with dressings on his left knee; walked with a limp; and used a crutch.  (Tr. 516.)  However, he complained that most of his pain was in his neck, and that the pain radiated down both arms into his hands.  (Tr. 516.)  Plaintiff also complained of pain in his lower left lumbar region and in both of his feet.  (Tr. 516.)  The EMG was negative for any radiculopathy.  (Tr. 516.)

9

The MRI revealed degenerative discs at L3-L4 with minimal bulging discs, and degenerative discs disease at L4-L5 with spur formation and a broad protruding disc. (Tr. 516; *see also* Tr. 579-80.)  Upon physical examination, Plaintiff's neck and lumbar areas revealed spasms, tenderness, and decreased range of motion.  (Tr. 516.)  Dr. Neuendorf diagnosed Plaintiff with neuropathic pain syndrome; lumbar radiculopathy; cervical radiculopathy; degenerative disc disease at C6-C7; and a protruding disc with degenerative disc disease at L4-L5.  (Tr. 516.)

### C.    Hearing Testimony

#### 1.    Plaintiff's Testimony

Plaintiff testified at his hearing as follows.  Plaintiff lives by himself, but on the same street as the rest of his family.  (Tr. 22.)  His family and friends help him take care of his house and go shopping for him.  (Tr. 22.)  He does not have a driver's license. (Tr. 22.)  He is unable to lift his grandchildren, who are four and six years old.  (Tr. 21.)  His arms are weak; he has bone spurs in his neck; and he suffers muscle deterioration. (Tr. 21.)  He cannot lift 20 pounds.  (*See* Tr. 21.)  His pain and worries interfere with his ability to sleep.  (Tr. 24.)  However, his medications do not cause him problems.  (Tr. 21.)

#### 2.    The VE's Testimony

The ALJ posed the following hypothetical to the VE:

[T]here's no past relevant work. Would you please assume a hypothetical individual with the claimant's education, training and work experience and this person would be able to lift and carry 10 pounds occasionally, three to five pounds frequently. This person would be able to sit for four hours in a typical workday, stand . . . or walk for four hours in a typical workday. This person should not do any crouching, crawling, or climbing. The other postural

10

maneuvers only occasionally. This person would be limited to simple routine repetitive tasks not performed in a fast-paced production environment with relatively few workplace changes. And this person would be limited to occasional interaction with supervisors, coworkers, and the general public.

(Tr. 29.)  The VE testified that such a person could perform other work as a surveillance system monitor / alarm monitor (for which there were 350,000 jobs in the national economy), and assembler (for which there were 200,000 jobs in the national economy). (Tr. 30-31.)

Plaintiff counsel then asked whether such a person who additionally would be off task between 15 and 20 percent of the time because of pain and psychological symptoms could perform other work.  (Tr. 31.)  The VE responded that such a person would not be able to perform other work.  (Tr. 31.)

## III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

11

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

## IV.   SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant has not engaged in substantial gainful activity since April 22, 2008, the application date.

2.    The claimant has the following severe impairments:  degenerative disc disease, degenerative joint disease, hepatitis C, major depressive disorder, borderline intellectual functioning, substance abuse by history, and personality disorder.

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the Listed Impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4.   After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift and carry ten pounds occasionally and three to five pounds frequently; to stand and walk for four hours in a regular eight hour workday; to sit for four hours in a typical workday; he must be afforded the option to sit or stand, changing position every thirty minutes; he can perform no crouching, crawling, or climbing, and can perform other postural maneuvers only occasionally; he is limited to simple, routine and repetitive work, not performed in a fast-paced production environment; he can tolerate only occasionally [sic] interaction with supervisors, coworkers, and the public; and finally, he can tolerate only very few workplace changes.

5.   The claimant has no past relevant work.

. . . . .

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work.

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10.  The claimant has not been under a disability, as defined in the Social Security Act, since April 22, 2008, the date the application was filed.

(Tr. 42-47.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole. *Heston v. Comm'r of*

13

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.**    **The ALJ's Assessment of Plaintiff's Credibility**

Plaintiff contends that the ALJ's credibility assessment of his subjective complaints of pain "was made without using the appropriate legal standards for evaluating [his] pain."  For the following reasons, this assignment of error is not well taken.

Pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).  When a claimant complains of

14

disabling pain, the Commissioner must apply a two step test to determine the credibility of such complaints that is known as the "Duncan Test."  *See Felisky* v Bowen, 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan* v. Sec'y of Health & Human Servs., 801 F.2d 847, 853 (6th Cir. 1986)).  First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain.  *Id.*  Second, if there is such an underlying medical condition, the Commissioner must examine whether the objective medical evidence confirms the alleged severity of pain or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain.  *Id.*

The Duncan Test does not require objective evidence of the alleged pain itself. *Id.* at 1039.  The ALJ must consider all of the relevant evidence, including the following:

(1)     the claimant's daily activities;

(2)     the location, duration, frequency, and intensity of the claimant's alleged pain;

(3)     precipitating and aggravating factors;

(4)     the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;

(5)     treatments other than medication that the claimant has received to relieve the pain; and

(6)     any measures that the claimant takes to relieve his pain.

*See Felisky*, 35 F.3d at 1039-40 (citing 20 C.F.R. § 404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman v. Chater*, 132 F.3d 32

(Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).  However, the

ALJ must be clear why he finds that a claimant's subjective statements are not credible:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

S.S.R. 96-7p, 1996 WL 374186, at *2 (1996).

  Here, the ALJ found that Plaintiff suffered medically determinable impairments

that could cause Plaintiff's alleged pain—namely, Plaintiff's degenerative disc disease

and degenerative joint disease.  Further, a review of the ALJ's decision reveals that the

ALJ discussed most, if not all, of the relevant factors in his assessment of Plaintiff's

RFC.  (*See* Tr. 44-45.)  The ALJ recognized that Plaintiff complained he could not

sustain lifting, bending, sitting, or walking because of chronic back and lower extremity

pain with limited range of motion.  (Tr. 44.)  However, the ALJ found that evidence

supported the conclusion that Plaintiff's subjective complaints of pain were not fully

credible.  Plaintiff's activities of daily living were pain-limited but nevertheless functional,

as Plaintiff was independent in self-care and could prepare simple meals, shop, and

perform light household chores.  (Tr. 44-45.)  Some of Plaintiff's statements in the

record were inconsistent, and some test results upon physical examination were

inconsistent and unreliable.  (Tr. 45.)  Although images of Plaintiff's lumbar and cervical

spine showed degenerative changes, there was no evidence of a herniated disc.  (Tr.

45.)  Plaintiff underwent a total left knee replacement, but post-surgical imaging showed

good alignment with no acute findings, and Plaintiff was given pain medication.  (Tr.

45.)  Plaintiff was neurologically intact and exhibited normal strength, sensation, and

reflexes during one examination; and the examining physician opined that Plaintiff did

not require an assistive ambulatory device.  (Tr. 45.)

Plaintiff has provided absolutely no explanation of how the ALJ's assessment of

his credibility was deficient.  Instead, Plaintiff merely recites the legal principals as set

forth in *Duncan* and *Felisky*, summarizes certain record evidence that is favorable to

Plaintiff's claims, and concludes that "substantial evidence proves that [Plaintiff's]

impairments and pain satisfy the requirements outlined in *Felisky*."  (Pl.'s Br. 17-19.)  To

the extent Plaintiff argues that substantial evidence "proves" that Plaintiff's "impairments

and pain satisfy the requirements outlined in *Felisky*," such an argument has no

recognizable basis in Social Security law.  And to the extent Plaintiff argues that

substantial evidence supports the conclusion that Plaintiff is more credible than the ALJ

found, such an argument is based on an incorrect legal standard, as a decision

supported by substantial evidence will not be overturned even though substantial

evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.  As Plaintiff has

provided no basis to conclude that the ALJ's assessment of Plaintiff's credibility was

deficient, this assignment of error is not well taken.

**C.      The ALJ's Assessment of Plaintiff Under the Listings**

Plaintiff contends that the ALJ erroneously assessed him under the Listings in

four ways:  (1) the ALJ's discussion of Plaintiff's back impairments was cursory; (2) the

ALJ failed to discuss Plaintiff's knee impairment and consider whether it met or

17

medically equaled Listing 1.02; (3) the ALJ failed to consider Plaintiff's back and knee impairments in combination; and (4) substantial evidence supports the conclusion that Plaintiff's impairments met or medically equal Listings 1.02 and 1.04.  For the following reasons, this assignment of error is not well taken.

Listing 1.02 regards "[m]ajor dysfunction of a joint(s) (due to any cause)," and, in relevant part, is:

> Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.[3]

---

[3] Listing 1.00B2b is titled "What We Mean by Inability to Ambulate Effectively," and provides the following:

> (1)  Definition. Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> (2)  To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace

18

Listing 1.02.

Listing 1.04 regards "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord," with:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);
>
> or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;
>
> or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing 1.04.

The ALJ stated that "[t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in" the Listings. (Tr. 42.) The ALJ then discussed Plaintiff's physical impairments as follows:

---

> with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

Listing 1.00B2b.

19

> The claimant's back impairment did not cause clinical evidence of significant nerve root compression, arachnoiditis, or stenosis resulting in pseudoclaudication. Likewise, the claimant's other musculoskeletal impairments have not resulted in an inability to ambulate or perform fine and gross movements as those terms are defined in the Listings.

(Tr. 42.)  Plaintiff contends that "this summary . . . does not provide a sufficient analysis of [his] back impairment under the [L]istings." (Pl.'s Br. 11.)  Plaintiff does not, however, cite case law in support of this contention, and the regulations "do[] not state that the ALJ must articulate, at length, the analysis of the medical equivalency issue." *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).  Further, it is evident that the ALJ considered Plaintiff's back impairment under Listing 1.04, as the ALJ explained that there was insufficient evidence of significant nerve root compression (as required by Listing 1.04's introductory paragraph and subparagraph A), arachnoiditis (as required by Listing 1.04 subparagraph B), or stenosis resulting in pseudoclaudication (as required by Listing 1.04 subparagraph C).  Accordingly, this contention is not well taken.

Plaintiff also contends that the ALJ failed to address his left knee impairment and consider it under Listing 1.02.  As an initial matter, "[t]he mere failure to discuss every single impairment under the step three analysis is not a procedural error." *Bledsoe*, 165 F. App'x at 411.  Nevertheless, although the ALJ did not expressly state at step three that he considered Plaintiff's left knee impairment, he stated that he considered Plaintiff's "other musculoskeletal impairments," which necessarily includes Plaintiff's left knee impairment; and the ALJ discussed Plaintiff's left knee impairment in his RFC assessment.  Further, it is evident that the ALJ considered Plaintiff's left knee impairment under Listing 1.02, as he explained that Plaintiff's other musculoskeletal impairments "have not resulted in an inability to ambulate or perform fine and gross

20

movements as those terms are defined in the Listings," and such findings correspond to whether those impairments involve a major peripheral weight-bearing joint—such as a knee—under Listing 1.02 subparagraph A.  Accordingly, this contention is not well taken.

Plaintiff further contends that the ALJ failed to consider his back and knee impairments in combination.  But the ALJ considered Plaintiff's back impairment and "other musculoskeletal impairments"; found that Plaintiff's other musculoskeletal impairments "likewise" did not result in an inability to ambulate effectively as defined in the Listings; stated that Plaintiff's impairments, *in combination*, did not meet or medically equal an impairment in the Listings; and discussed the evidence of both Plaintiff's back and knee impairments in his RFC assessment.  Accordingly, the Court is not persuaded that the ALJ failed to consider Plaintiff's back and knee impairments in combination.  *See Bledsoe*, 165 F. App'x at 411 ("The ALJ made a finding that 'the medical evidence establishes that the claimant has 'severe' impairments . . . but that she does not have an impairment or combination of impairments listed in, or medically equal to the one[s] listed . . . .  The ALJ also made specific factual findings about the credibility of witnesses and expert reports.  These findings show the ALJ did consider whether a combination of all Bledsoe's impairments was medically equal [to] a 'listed impairment,' and is supported by substantial evidence.") (internal citation omitted).

Finally, Plaintiff contends that substantial evidence supports the conclusion that he meets or medically equals Listings 1.02 and 1.04 and cites evidence in support. Plaintiff again argues the wrong legal standard, as a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite

conclusion.  *Ealy*, 594 F.3d at 512.  Plaintiff has not taken issue with the factual findings upon which the ALJ rested his decision, and has failed to show that the ALJ's assessment of his credibility was deficient.  The Court finds no basis to conclude that the ALJ's decision lacks the support of substantial evidence.  Accordingly, this assignment of error lacks merit.

### VI.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: March 14, 2012